**In re GAS RECLAMATION, INCORPO-RATED, A Texas Corporation, and Certain "G.R.I." Investors (G.R.I. Joint Venturers).**

**Bankruptcy No. 85–01304–H3–5.**

United States Bankruptcy Court,
S.D. Texas.

Aug. 1, 1985.

Robert C. Maley, Jr., Sheinfeld, Maley & Kay, and J. Craig Cowgill, Hoppess, Cowgill & Emmot, Houston, Tex., for Gas Reclamation, Inc.

William B. Chaney, Shank, Irwin & Conant, Dallas, Tex., and Daniel A. Zimmerman, Kinley, Kumble, Wagner, Hune, Underberg, Manley & Casey, New York City, for Northwestern Nat. Ins. Co. of Milwaukee, Wis.

John R. Knight, Morris & Campbell, Houston, Tex., for Haas Securities.

Douglas M. Robison, Geary, Stahl & Spencer, Dallas, Tex., for twenty-six "G.R.I." Investors.

OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration of the motion filed by Northwestern National Insurance Company of Milwaukee, Wisconsin, hereinafter referred to as movant, to declare Gas Reclamation, Incorporated, hereinafter referred to as G.R.I., the sole debtor in this case, as well as, for the appointment of a trustee or, in the alternative, for conversion of this case to a proceeding under Chapter 7; as well as, on consideration of the motion filed to dismiss; all parties being represented by their respective attorneys of record; on presentation of proof and argument; and the Court having heard and considered same, finds as follows, to-wit:

I.

This case was initially commenced on February 25, 1985, with the filing of a voluntary Chapter 11 petition captioned, Gas Reclamation, Incorporated, a Texas Corporation, and Certain "G.R.I." Investors (G.R.I. Joint Venturers). The voluntary petition was executed by Howard B. Butler, Jr., as attorney for the petitioner, and contained the corporate declaration that Mr. Butler was secretary of G.R.I., and stated under penalty of perjury that the petition was true and correct, as well as, that the filing of the petition on behalf of the corporation had been authorized. (Movant's Exhibit 1) The petition contained the correct mailing address and the tax identification number for G.R.I., and reflected that the petitioner's business was as follows: "G.R.I. manufactures, installs, and operates Investor owned portable natural gas processing plants which are sold to

said Investors pursuant to the Private Offering Exemption from registration contained in Section 4(z)(sic) of the Securities Act of 1933, Regulation D promulgated thereunder and similar provisions under applicable states' laws." A supplemental petition and declaration, filed contemporaneously with the form voluntary petition, which reflected background information relevant to G.R.I., stated, "This application involves only the Joint Venture relationship and not Gas Reclamation, Incorporated, a Texas corporation." (Debtor's Exhibit 1) The schedules and statement of financial affairs reflected the identical caption as the voluntary petition and were also executed by Howard B. Butler, Jr. Appended thereto was a second corporate declaration. (Debtor's Exhibit 1, Movant's Exhibit 2) The information furnished on the statement of affairs appears to be pertinent to an entity other than a regular business corporation, and the schedules list only two creditors, i.e., Intercontinental Monetary Corporation, 375 Park Avenue, Suite 1709, New York, New York, 10152, and Northwestern National Insurance Company, 731 North Jackson, Milwaukee, Wisconsin, 53201. From the testimony, this listing would not be inclusive of all the creditors of G.R.I. A first amended petition and declaration, also executed by Howard B. Butler, Jr., was filed on March 1, 1984, and contained the same disclaimer, i.e., that the application only involved the joint venture relationship and not Gas Reclamation, Incorporated, a Texas Corporation. (Debtor's Exhibit 2)

For purposes of this hearing, the parties have stipulated that there is no joint venture relationship existing between G.R.I., and the several investors, as well as, that since none of the investors have consented to this bankruptcy filing, that none of the investors are considered debtors in this case. Therefore, the first issue that must be decided is whether there is, in fact, a legitimate debtor before the Court, and, if so, whether a Trustee should be appointed.

## II.

Prior to addressing either issue, a brief factual background should be set forth:

G.R.I. manufactured and/or purchased portable gas processing plants which were placed at various well sites to be utilized for the liquification of vented gases. These plants were sold to investors along with related maintenance contracts which provide that G.R.I. is to receive 38% of the gross profits generated from the production and sale of the liquified gases. When purchasing the plants, denominated as units, the investor paid a 5% downpayment to G.R.I. and executed a promissory note for the balance of the purchase price. The purchase price ranged from $79,900.00 (Movant's Exhibit 3, Private Placement Memorandum, dated April 12, 1984) to $83,-000.00 (Movant's Exhibit 5, Private Placement Memorandum, dated December 11, 1984). Northwestern National Life Insurance Company bonded or guaranteed the payment of the notes pursuant to an indemnity agreement executed with G.R.I., and the notes were then sold at 95% of face value by G.R.I. to Intercontinental Monetary Fund. The revenues generated from the production and sale of the liquified gases were to be utilized to service the investors' promissory notes. G.R.I. treated the sales to the investors as investment contract securities and sold the units in reliance upon the private offering exemption from registration contained in § 4(2) of the Securities Act of 1933, Regulation D, as well as, under applicable state law provisions related to transactions not involving a public offering or solicitation. Considering the cost to manufacture the gas processing plants compared to the resale purchase price, the investment transactions were structured to be highly profitable to G.R.I. Although the precise numbers were conflicting in the exhibits and testimony, approximately 200 units were sold to investors with the related promissory notes being correspondingly sold by G.R.I. to International Monetary Fund following the guarantee of Northwestern National Life Insurance Company. An additional 200 units were sold to investors, but the related promissory notes were not sold or guaran-

teed, and these 200 units remain "unfunded". G.R.I. ceased its manufacturing activities in December, 1984, and has not resumed manufacturing as of the date of this hearing. Very little revenue has been produced by the gas processing plants in the field, and at the present time, these units would be considered, more or less, in a dormant state. The employment staff of G.R.I. has been scaled down to approximately seventeen employees, five of whom are responsible for all field operations.

G.R.I. is owned by two shareholders, both holding a 50% interest in the issued and outstanding capital stock. They are identified as Dr. Gordon D. Lewis, an orthopedic surgeon who resides in the State of California, and Gordon Hugh Bradbury, the owner of an oil and gas investment firm who also resides in the State of California. The Board of Directors was structured to contain five members, but there are now only three members serving. From the information available, it seems that two of the members resigned, George N. Garrett and Robert Clay Underwood, and were never replaced. The Board is now comprised of Harrison A. Storms, Jr., who serves as Chairman of the Board and Chief Executive Officer, and the two stockholders, Dr. Gordon D. Lewis and Gordon Hugh Bradbury. Other than Mr. Storms, who proclaims that he runs the company, the Board of Directors as an entity exists for all practical purposes in name only. From the evidence presented, a reasonable inference could be drawn that G.R.I. operates on its own inertia. However, if one reads between the lines, the implication is that the significant day to day decisions for the company are made by three individuals other than Mr. Storms. These individuals are Michael A.S. Makris, who is employed as a so called "consultant", and who, during his testimony, invoked the privileges of the Fifth Amendment to the United States Constitution against self incrimination at least 100 times; Bob L. Jordan, who is employed as Executive Vice President with responsibilities in the area of marketing the gas processing units to investors; and Howard B. Butler, Jr., Secretary and General Counsel to the corporation, who executed the bankruptcy documents as mentioned hereinabove. It should be noted at this point that Mr. Jordan, during his testimony, invoked the privilege against self-incrimination on at least two occasions, while Dr. Lewis and Mr. Bradbury, during their discovery depositions, invoked this privilege on innumerable occasions. Coincidentally, in one of his few responses to questions propounded, Mr. Bradbury indicated that he thought Bob L. Jordan was a member of the corporate Board of Directors. This merely underscores the observation that this corporation conducts its business affairs like a ship without a rudder.

### III.

The posture of this case reminds one of the "topsy-turvy world" found in *Alice in Wonderland.* Ordinarily, one would expect the creditors to be before the Court demanding the dismissal of the case because of its amorphous characterization or certainly alleging a lack of corporate authority to support the filing. To the contrary, the debtor, if there is such an entity, seeks dismissal for these same reasons, and the movant creditor is resisting dismissal stridently.

The movant urges the Court to deny dismissal because it would like to preserve the initial filing date, i.e., February 25, 1985, for purposes of the avoidance of possible preferential transfers and/or fraudulent conveyances. G.R.I. counters by stating that it never intended to be a debtor in this case, and that if it is declared to be so, that the movant will have effected an involuntary bankruptcy without meeting the requirements of 11 U.S.C. § 303. The Court makes two observations at this point: (1) There is nothing to prevent the movant from seeking an involuntary adjudication against G.R.I. at this time, nor has there been any such impediment since this case was initially filed; (2) If voidable preferential transfers do, in fact, exist, most of these transfers appear to have been made to persons or entities that would be considered insiders, as that term is defined in

11 U.S.C. 101(28). Consequently, this Court is of the opinion that any prejudice to the movant that could be brought on by dismissal at this time is at best minimal.

IV.

At the conclusion of the testimony and the oral argument, the Court made the comment that the decision to appoint a trustee in this case would not be difficult if there was a legitimate filing. The movant has more than met the requirements of 11 U.S.C. § 1104, which provides as follows:

(a) At any time after the commencement of the case, but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

The factors listed hereinbelow ordinarily would merit the appointment of a trustee without hesitation:

1. No person in management has a firm grip on the day to day operations of this company. It was astonishing to hear that no one would acknowledge the preparation or the granting of authority to disseminate the plan of action for G.R.I., as well as, the rescission request submitted to the investors. (Movant's Exhibits 14 and 15)

2. The manufacturing process has been shut down since December, 1984, and the majority of the gas processing units located in the field are in a non-productive status. An inference can be drawn from the testimony that these units were under designed and were incapable of meeting the projected production.

3. The gas processing units have produced only sparse revenue from the sale of the liquid gas. This revenue is being utilized by G.R.I. to pay operating expenses and payroll, rather than being distributed to the investors pursuant to the various investment contracts. It is noted parenthetically that since the investors received no income from the units, for the most part they have refused to pay the promissory notes to G.R.I. and/or Intercontinental Monetary Fund.

4. Unless the gas processing units are substantially refurbished and put on wells with economically feasible productive capabilities, there will never be hope for meaningful income to the company or to the investors. No funds appear to be available for such capital improvements.

5. Certain corporate officers and employees have received extravagant bonuses and/or commissions paid from the proceeds received from the marketing of the gas processing units. Bob L. Jordan received approximately $800,000.00, within a relatively short period of time, allegedly for consulting services, commissions, and/or bonuses. (Movant's Exhibit 22)

6. There were numerous inter-company transactions, involving substantial sums of money, between G.R.I. and Roseneath Research, Inc., a corporation also owned by Dr. Lewis and Mr. Bradbury, but run as is G.R.I. by the will-o'-the-wisp, Mr. Makris. Makris was convicted in 1972 following a three count indictment for perjury. After serving a period of incarceration, Makris was placed on supervised probation, which is in effect at the present time, conditioned that he cease from any dealings, directly or indirectly, in securities regulated by the Securities and Exchange Commission, as well as, that he refrain from any other dealings in any other securities such as stocks, bonds, notes, and other businesses related to the handling of securities.

7. The gas processing units located in the field are largely unprotected. There are only five employees available to provide security for these properties which are installed at well sites located over a multistate area.

8. A general ledger trial balance, effective December 31, 1984, for G.R.I. was

introduced as Movant's Exhibit 35. This document contained several revealing features, to-wit:

a. There was an accounts receivable entry from Roseneath Research, Inc., in the sum of $743,490.00, which, according to the testimony of Gasper Mir, a certified public accountant, employed by Pete Marwick Mitchell and Company, represented advances paid by G.R.I. to Roseneath Research, Inc.

b. There was an accounts payable entry for commissions, ostensibly earned because of the investment sales, in the sum of $6,930,000.00. There was an entry reflecting bonuses paid in the sum of $629,718.98, as well as, an entry for consulting fees in the sum of $507,787.88.

c. There was a notes receivable entry for shareholders, which according to Mr. Mir, represented a payment by G.R.I. *for the benefit of the two shareholders* in settlement of personal litigation in the sum of $452,256.02.

d. There was an entry for trade accounts receivable in the sum of $16,837,-717.04, which represents the value of the promissory notes executed on the 200 gas processing units sold, but which remain unfunded since the promissory notes were not correspondingly sold. This should be compared to the deferred cost of sales in the sum of $5,643,000.00, as well as, a deferred sales payable account in the sum of $14,193,000.00.

e. The capital contribution made by the stockholders as of June 30, 1984, was the sum of $103,792.00, while the net income for the corporation, excluding the deferred sales, was the sum of $4,042,802.41.

f. There is an entry entitled cost of sales—commissions in the sum of $1,397,-205.17, which is in addition to the accounts payable—commissions entry as set forth hereinabove.

g. There is an entry reflecting the closing costs for the investment transactions showing a total expended in the sum of $3,242,974.41.

h. There is an entry reflecting accrued federal income taxes in the sum of $2,000,-000.00.

These features, many of which would raise the eyebrow of a prudent investor, are not all inclusive.

9. Mr. Storms testified that he could not explain what happened to the profit, which was shown as being in excess of $4,000,-000.00, on the December, 1984, income statement. Mary Whitt, the denominated controller of G.R.I. candidly advised that she did not understand the corporate accounting system. If the controller doesn't understand, who does?

10. The Private Placement Memorandum issued by G.R.I., dated December 11, 1984, reflects that certain affiliates of the company, who are otherwise unidentified, received estimated payments which have now been determined to have been substantially in excess of the amounts to which they were entitled as a result of actual liquids production attributable to their processing units.

11. G.R.I. disposed of vehicles valued at $30,512.50, without Court order on or about May 28, 1985, to Petrogas Field Services. (Movant's Exhibit 20)

From the above enumerated reasons, there is no question that if there is a bona fide debtor that the appointment of a trustee is essential. However, the question of whether there is a debtor is much more difficult to answer. In this case, it has become purely a discretionary judgment decision with pluses and minuses on both sides of the issue. It is much like having to call the third strike which ends the ballgame when the pitch has just nicked a corner of the plate.

## V.

When rendering a decision, this Court usually does not consider what might happen on appeal. In this case, because the decision could easily go either way, somewhat in the eyes of the beholder, consideration must be given to the ramifications of an appeal. As such, the Court must give

thought as to who will be more adversely impacted should this decision be reversed. For example, if this case was decided at this juncture for the movant, i.e., that G.R.I. was the sole debtor and that a trustee should be appointed, and if the decision was reversed on appeal, more time will be lost to the movant who is rightfully concerned about the possibilities of preferential transfers and fraudulent conveyances.

## VI.

The methodology behind this bankruptcy filing has all the attributes *on the surface* of the theme expressed in Jimmy Breslin's parodic novel, *The Gang That Couldn't Shoot Straight.* Howard Butler testified that he was advised to file the bankruptcy petition by Bob Jordan. Jordan testified that he discussed the filing of *a* bankruptcy case with the members of the Board of Directors as "an alternative". The Board members, particularly, Mr. Storms and Mr. Bradbury, stated that they were not aware of the actual filing until after the fact. Even after becoming aware, they were informed that the bankruptcy was filed on behalf of the joint venture enterprise, rather than for G.R.I. as a corporate entity per se. Were these bunglings actually a cleverly contrived "time buying" scheme? Unfortunately, the proof did not answer this question.

■ In a corporate context, there must be proper authorization to file a bankruptcy petition. The corporation speaks only through the minutes of its Board of Directors. See *In Re: Alwyn Food Distributors, Inc.*, 8 B.R. 42, 7 BCD 126 (Bkrtcy.M. D.Fl.—1980), *In Re: Autumn Press, Inc.*, 20 B.R. 60 (Bkrtcy.D.C.Ma.—1982), *In Re: Jefferson Casket Company*, 182 F. 689 (D.C.N.Y.—1910), *Shearin v. Cortez Oil Company*, 92 F.2d 855 (C.A. 5th Cir.—1937), *In Re: Free Gold Mining and Milling Co.*, 2 F.Supp. 118 (D.C.Mt.—1933), *Louisiana Investment and Loan Corp.*, 224 F.Supp. 274 (E.D.La.—1963), Aff'd. 242 F.2d 999 (C.A. 5th Cir.—1965), and *In Re:*

*American International Industries, Inc.*, 10 B.R. 695 (Bkrtcy.S.D.Fl.—1981).

■ If there has been no proper corporate authorization, the filing can still be valid if there has been a subsequent ratification or acquiescence on behalf of the corporation. See *In Re: American Bond and Mortgage Co.*, 61 F.2d 875 (C.A. 7th Cir.), Aff'd. 289 U.S. 165, 53 S.Ct. 551, 77 L.Ed. 1100 (1932), *Alexander and Farmer's Supply Co.*, 275 F. 824 (C.A. 5th Cir.—1921), *In Re: Peoples Warehouse Co.*, 273 F. 611 (D.C.Ms.—1921), and *In Re: Valles Mechanical Industries, Inc.*, 20 B.R. 355 (Bkrtcy.N.D.Ga.—1982).

■ There is no question but that a joint venture filing was not effected. There has been no pretense of consent to such by the investors. As such, does the decision reached in *In Re: Clem*, 29 B.R. 3 (Bkrtcy. D.Id.—1982), mean, as the movant contends, that the G.R.I. investors are merely surplus names in the caption and that G.R.I., a Texas corporation, is therefore the sole debtor? I think not. There still must be appropriate authorization to file as a corporation or subsequent acquiescence on behalf of the corporation. *In Re: Clem*, involved individuals, who in addition to the captioned surplus partnership entities, obviously wanted to be in bankruptcy and were capable of filing same. Although the tax identification number, the mailing address, and the corporate declaration signed by Howard Butler imply that G.R.I. is the debtor, the disclaimer, i.e., that the filing is not intended for Gas Reclamation, Incorporated, a Texas corporation, as well as, the format of the statement of affairs and the schedules, listing only two creditors, are to the contrary.

The movant has attempted to show that this corporation acquiesced or ratified the bankruptcy filing by actions taken in this Court. The first incident involves the invocation of the automatic stay through a letter written by Howard Butler to Northwestern National Insurance Company with a copy to Intercontinental Monetary Corporation. (Movant's Exhibit 8) I find this letter to be more supportive of the proposi-

tion that at least Mr. Butler, representing G.R.I., considered the bankruptcy filing to be on behalf of a joint venture. The letter clearly states that the automatic stay is applicable to any actions contemplated against both G.R.I. and its investors. There is no language attempting to invoke the benefits of the stay exclusively for G.R.I.

The second incident which is alleged to support acquiescence is the filing of a request for hearing by G.R.I. in response to a motion seeking relief from the automatic stay filed by the corporate landlord who desired to evict G.R.I. from its leased offices. The filing of this request for hearing without further response is not persuasive that the corporation acquiesced to be denominated as the sole debtor in this bankruptcy case.

Contrary to the movant's interpretation, the filing of the operating report (Movant's Exhibit 49), which plainly refers to the G.R.I. joint venture profit and loss statement and the G.R.I. joint venture liquid revenue account, explicitly implies that the debtor is not solely G.R.I. Likewise, the entry of the consent order, (Movant's Exhibit 28), wherein G.R.I. agreed to refrain from selling any of its assets or any "alleged" joint venture assets other than in the ordinary course of business without Court approval, is equally not persuasive that legally sufficient acquiescence on behalf of G.R.I. has occurred.

These incidents of conduct support the position, however improvident, of the G.R.I. officers, director, etc.—that there was a bankruptcy case ongoing, but applicable to an entity other than G.R.I. Ratification or acquiescence cannot be predicated unintentionally.

## VII.

From the totality of the testimony, I find no proper authorization to file this bankruptcy case. Howard Butler, as the corporate attorney, may be liable for his errant acts pursuant to Rule 9011, Rules of Bankruptcy Procedure; however, that matter is not before the Court at this time. Since all

of the persons affiliated with G.R.I. adamantly maintain that this bankruptcy case was filed for a joint venture entity, I find no acquiescence to a bankruptcy filing on behalf of G.R.I. as sole debtor.

If this conclusion appears similar to the case where the defendant is freed because of a legal technicality, such similarity is not the product of the author of this Opinion— the facts merely speak for themselves.

The motion to dismiss will be sustained.

An Order will be entered consistent with this Opinion.